Charles Edward SWEENEY, Jr.,
Appellant (Defendant
below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 10S00–9603–CR–231.

Supreme Court of Indiana.

Dec. 18, 1998.

John L. Davis, Bonnie K. Wooten, Pritzke & Davis, Greenfield, for Appellant.

Jeffrey A. Modisett, Attorney General, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, for Appellee.

SULLIVAN, Justice.

Defendant Charles Edward Sweeney, Jr., appeals his conviction for Murder.[1] Defendant was sentenced to 60 years. We have jurisdiction over this direct appeal because the longest single sentence exceeds 50 years. Ind. Const. art. VII, § 4; Ind.Appellate Rule 4(A)(7). We affirm defendant's conviction and sentence.

### Background

On May 28, 1991, the victim, Danny Guthrie, left his family to go fishing with defendant. Guthrie did not return home that evening and his wife assumed that he decided to camp over with defendant. The next morning defendant called to see if Guthrie wanted to check the trout lines. Guthrie's wife informed the defendant that Guthrie never returned home and the defendant told Guthrie's wife that he brought Guthrie home between 4:00 and 6:00 p.m. the previous day. After several unsuccessful attempts to obtain more information from defendant, Guthrie's wife called the police. On May 29, 1991, Detective Kramer, the lead investigator, and other police officers questioned the defendant at his home. However, no arrest was made and Guthrie remained missing.

In February, 1992, defendant was investigated by the Bureau of Alcohol, Tobacco and Firearms for placing a pipe bomb under Detective Kramer's police car.[2] After being charged for these offenses, defendant entered into a plea agreement with the U.S. Attorney's Office on June 26, 1992. Pursuant to the plea agreement, defendant pled guilty to placing the bomb under Kramer's car, agreed to implicate all others involved in the bombing and also to disclose the wherea-

---

1. Ind.Code § 35–42–1–1 (Supp.1990).

2. Defendant claimed that he placed the bomb under Kramer's police car because Kramer had been " 'hounding him' on the missing person investigation of Guthrie." (R. at 51.) As a result of placing the pipe bomb under Kramer's car, defendant was charged with the federal offenses of Attempting to Damage a Vehicle by Use of a Bomb (Title 18, U.S.Code, § 844(i)) and using a bomb in connection with a crime of violence (Title 18, U.S.Code, § 924(c)). (R. at 19.)

bout of Guthrie's body and any information relating to the cause of Guthrie's death.[3] We summarize defendant's story as communicated to federal authorities as follows.[4]

According to defendant, on the return trip from the fishing expedition, defendant agreed to give Guthrie approximately 150 marijuana plants in exchange for a saddle. Immediately after arriving at defendant's home, defendant explained to Guthrie where the marijuana plants were located and provided Guthrie with a shovel, two buckets, and a 9 mm gun for protection. Defendant claimed that he then went to play bingo at the Sellersburg Moose Lodge and did not see Guthrie again that evening.[5] The next day (May 29, 1991), after Guthrie's wife claimed that Guthrie never came home, defendant alleges that he went to look for Guthrie and found him dead with a gunshot wound to the head. He also found the 9mm gun that he had given Guthrie the day before with one round missing and an empty shell casing a foot or two south of Guthrie's body. Because defendant did not want the police to discover the marijuana, he dragged Guthrie's body to a ditch located behind a trailer and buried the body with sweet lime and covered it with dirt and trash. He then threw the shell casings in a creek, and placed one shoe[6] and a pair of sunglasses in the burn barrel by his trailer. Defendant also buried the gun in an ammunition can near his home, but at a later date retrieved the gun and had it in his possession for personal protection. Defendant told the authorities that eventually the gun was seized from him in the State of Utah

as a result of a routine traffic violation. At all times, defendant proclaimed his innocence.[7]

· On July 1, 1992, the police obtained a search warrant for defendant's property and located Guthrie's body in the area described by defendant. An autopsy was performed on the body on July 2, 1992, and the medical examiner positively identified the body as that of Daniel Guthrie. The examiner also retrieved the bullet that caused Guthrie's death. The bullet and the 9mm gun that was confiscated from defendant by a Utah police officer was sent to the Bureau of Alcohol, Tobacco and Firearm Laboratory. The Bureau confirmed that the bullet that killed Guthrie had been fired from the 9mm gun belonging to the defendant.

On August 10, 1992, Judge Donahue in the Clark Circuit Court issued a warrant to arrest the defendant for the murder of Guthrie. On October, 8, 1992, upon the State's request, Judge Donahue issued a writ of habeas corpus ad prosequendum (a writ of habeas corpus ad prosequendum is referred to in this opinion as a "Writ") so that the State could obtain temporary custody of defendant. At that time, defendant was incarcerated in federal prison in Louisville, Kentucky[8] and was scheduled to be sentenced that very same day by Judge Barker in the United States District Court for the Southern District of Indiana.[9] The defendant was transported to Clark County shortly after the Writ was issued. On October 22, 1992, defendant filed a Motion to Quash the Writ,

---

3. We presume that because the federal charges concerned Kramer and because Kramer had knowledge of defendant's possible role in the missing person of Guthrie, the federal plea agreement was based on defendant providing information regarding Guthrie's whereabouts.

4. Defendant did not testify at trial nor is there a transcript of the defendant's statements to federal authorities in compliance with the plea agreement. However, several of the officers present at the time defendant provided his story testified at trial as to their recollection of defendant's statements.

5. Mike Jones, a former Governor of the Sellersburg Moose Lodge, testified that in 1991, the Moose Lodge operated a Bingo game every Wednesday and Friday night from 7:30 to 10:00 p.m.

(R. at 1520–21.) May 28, 1991, the night that defendant claimed to play bingo, fell on a Tuesday.

6. Defendant found Guthrie wearing only one shoe and the other shoe about 30–40 feet from the body. (R. at 1601.)

7. While providing these statements to federal authorities, defendant indicated that he thought Guthrie was working for the police. (R. at 1312.)

8. The record suggests that defendant was initially incarcerated in the Federal Bureau of Prisons in Leavenworth, Kansas. (R. at 19.)

9. Defendant was sentenced to serve 210 months in federal prison. (R. at 501.)

and a hearing was held on the motion on November 10, 1992. The focus of the hearing concerned whether the State had jurisdiction over the defendant. Defendant argued that before he was sentenced in federal court, the State could have sought temporary custody of him through the use of the Writ, but once defendant was sentenced, the State was obligated to follow the procedures set forth in the Interstate Agreement on Detainers (referred to in this opinion as the "IAD").[10] In order to avoid conducting a trial and then having a higher court decide that the trial court had no jurisdiction over defendant, Judge Donahue decided that the safer approach would be to return defendant to federal prison and proceed appropriately. Consequently, Judge Donahue granted defendant's motion and ordered that the Writ be held for naught and declared void.

On April 22, 1993, the State dismissed charges against the defendant, and defendant was sent back to federal prison in Kentucky. The State refiled charges on March 30, 1994. On August 1, 1994, upon the State's request, Judge Donahue granted another writ of habeas corpus ad prosequendum so that the State could obtain temporary custody of defendant. At this time, defendant was being held at the Federal Correctional Institution in Manchester, Kentucky. For the second time, defendant was transported to Clark County. In response, defendant filed a Motion to Quash the Writ on September 13, 1994, and on October 3, 1994, Judge Donahue held a hearing on this matter. Once again, defendant contended that the IAD was the exclusive means of obtaining temporary custody of defendant. Additionally, defendant argued that the circumstances surrounding the issuance of both Writs were identical and that because the issue had been litigated, the doctrine of res judicata and collateral estoppel applied. Judge Donahue denied defendant's Motion to Quash the Writ, relying on the fact that defendant's custody status had changed since the first Writ was issued.

A jury trial was conducted on November 14, 1995, and defendant was found guilty the murder of Guthrie. The trial court sentenced defendant to 60 years to be served upon the completion of his federal sentence of 210 months.

Additional facts will be provided as necessary.

### Discussion

Defendant raises the following claims on appeal: (1) the trial court erred in denying his motion to quash the second writ of habeas corpus ad prosequendum; (2) defendant was denied his statutory and constitutional right to a speedy trial; (3) the trial court erred in refusing to suppress defendant's pre-trial statements; (4) the trial court erred in denying defendant's motion to suppress the handgun; (5) defendant was denied the right to cross-examine witnesses; (6) the trial court erred in denying the defendant credit time for pre-trial detention; (7) the trial court failed to articulate the reasons for sentencing defendant to a term of years consecutive with his federal sentence and used an improper factor to enhance defendant's sentence; (8) the trial court refused to admit certain statements provided by defendant; (9) the trial court refused to allow testimony concerning other possible reasons for the death of the victim; and (10) the State failed to establish the corpus delicti for the Murder.

### I

Defendant contends that the trial court erred in denying his motion to quash the second Writ. As discussed in *Background supra*, defendant's motion to quash the first Writ was granted. In defendant's motion to quash the second Writ issued against him, defendant argued that because both the first and second Writs were identical, the issue had been litigated in the hearing on the first Writ. As such, the doctrine of res judicata applied to bar enforcement of the second Writ. We disagree with defendant.

10. Defendant makes a distinction between use of the word "confined" in the statute providing for the Writ and use of the word "incarcerated" in the statute providing for the IAD. Black's Law Dictionary (5th ed.) defines incarcerations as

"Imprisonment; confinement in a jail or penitentiary." Confinement is defined as "State of being confined; shut in; imprisoned...." We discuss these two statutes in detail *infra*.

"The principle of res judicata prevents the repetitious litigation of that which is essentially the same dispute." *Wagle v. Henry,* 679 N.E.2d 1002, 1005 (Ind.Ct.App.1997) (citing *Scott v. Scott,* 668 N.E.2d 691, 699 (Ind. Ct.App.1996)). "For principles of res judicata to apply, there must have been a final judgment on the merits and that judgment must have been entered by a court of competent jurisdiction." *Matter of Sheaffer,* 655 N.E.2d 1214, 1217 (Ind.1995).[11]

In his motion to quash the first Writ, defendant argued that the IAD provided the exclusive means by which the State could secure his presence for trial and that a Writ was not available for this purpose. Our statute authorizing Writs provides that it may be used to seek the presence for criminal trial in state court of a defendant "who is confined in a federal prison." Ind.Code § 35–33–10–5. The record indicates that at the time the first Writ was issued, defendant had not yet been sentenced on federal charges and was being held on behalf of federal authorities in a Kentucky state correctional facility. Our review of the record indicates that the trial court concluded that, under these circumstances, the defendant was not confined in a federal prison within the meaning of the Writ statute. *See* R. at 527–28. The trial court granted the motion to quash the first Writ because, not yet having been sentenced on federal charges (albeit guilty thereof) and not being confined in a federal prison (albeit in custody for federal offenses), only the IAD and not the Writ procedures were available to the state to secure defendant's presence for trial. (The mutual availability of IAD and Writ procedures is discussed in part II, *infra;* it is not essential to do so here.) However, we hold that the trial court made no determination that the Writ procedures would be unavailable at some future time should defendant be sentenced and confined in a federal prison. (This is in fact what happened). As such, in granting defendant's motion to quash the first Writ, the trial court only held that the Writ was not available to secure the

presence for trial of the defendant given defendant's custody status at the time the first Writ was issued. This is clear from the trial court's findings and conclusions denying the motion to quash the second Writ:

4. It is unclear from the Order of November 10, 1992, the grounds upon which the Writ was quashed. No Findings of Fact or Conclusions of Law were entered. During the argument on the Motion in 1992, some argument was had relating to the custody status of the Defendant. At the time of the Motion in 1992, the Defendant was not housed in a federal prison. When the 1994 Writ was issued and served, the Defendant was housed in a federal prison at the Federal Correctional Institution in Manchester, Kentucky.

5. I.C. 35–33–10–5 requires that the Defendant be "confined in a federal prison or other institution" before a Writ of Habeas Corpus Ad Prosequendum may issue.

6. In light of the general nature of the 1992 Order quashing the Writ, and in light of the Defendant's change of custody status since 1992, the issue now facing the Court cannot be said to have been litigated and determined previously. It cannot be said that the 1992 Order determined that a Writ of Habeas Corpus Ad Prosequendum would forever be an improper means of securing the attendance of a Defendant in federal custody. On this basis, the doctrines of res judicata and collateral estoppel do not bar litigation of the issues raised by the 1994 Writ of Habeas Corpus Ad Prosequendum and the Defendant's Motion to Quash.

(R. at 85–86.)

Because the trial court's determination to grant the motion to quash the first Writ was a function of the defendant's custody status at the time the first writ was issued, *res judicata* did not preclude the trial court from reaching a different determination after defendant's custody status had changed. *See Matter of a Search Warrant,* 448 N.E.2d 1089, 1094 (Ind.Ct.App.1983)("Each search

11. The doctrine of res judicata is divided into two subdoctrines—claim preclusion and issue preclusion (collateral estoppel). Defendant asserts that both subdoctrines apply. However,

because we conclude that the hearing on the motion to quash the first Writ did not result in a final judgment on the merits, it is unnecessary to analyze the subdoctrines of res judicata.

warrant application was a distinct justiciable matter, supported by independent proof.").

## II

Defendant claims that he was entitled to have the murder charges against him dismissed because the State violated the anti-shuffling provision of the IAD. In general, the IAD prohibits the transporting of defendants back and forth between jurisdictions. Defendant contends that by being transported back and forth between Indiana and Kentucky (as described in *Background supra*), the anti-shuffling provision of the IAD was violated. Defendant's argument is correct if in fact the IAD is applicable in this case. *See generally State v. Greenwood,* 665 N.E.2d 579, 583 (Ind.1996) (the IAD "requires dismissal with prejudice if the prisoner is returned to the first state prior to trial").

■ Analyzing defendant's claim requires a discussion of two Indiana statutes—Ind. Code § 35–33–10–4 (1988), adopting the IAD, and Ind. Code § 35–33–10–5 (1988), providing for Writs. While the statutes are separate and distinct, they have similar purposes in that both set forth procedural safeguards for securing the presence of a prisoner in Indiana who is located in a foreign jurisdiction.[12] *See generally United States v. Kenaan,* 557 F.2d 912, 915 (1st Cir.1977).

## A

We begin with a brief discussion of the history and function of both the IAD and the Writ. Although the origins of the IAD date back to 1948, the statute was not adopted by the federal government until 1970. The statute was created to solve several problems which arose from the use of detainers. Although the IAD does not define a detainer, the congressional record provides that "[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." *United States v. Mauro,* 436 U.S. 340, 359, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978) (quoting H.R.Rep. No. 91–1018, p. 2 (1970); S.Rep. No. 91–1356, p. 2 (1970; U.S.Code Cong. & Admin.News 1970, p. 4865)). "Before the [IAD] was enacted, there was no legal mechanism for prisoners to clear detainers filed against them by authorities outside the jurisdiction in which they were imprisoned." *United States v. Collins,* 90 F.3d 1420, 1425 n. 1 (9th Cir.1996) (citing *Birdwell v. Skeen,* 983 F.2d 1332, 1335 (5th Cir.1993)). Consequently, detainers had the capability of restricting, circumscribing, or disrupting the activities, including rehabilitative activities, of prisoners within the 'sending state's' prison.[13] *Flick v. Blevins,* 887 F.2d 778, 781 (7th Cir. 1989). *See Greenwood,* 665 N.E.2d at 583. This is because in the past, detainers would remain lodged against a prisoner for several years and cause serious problems: (1) the prisoner would be ineligible for work assignments and (2) the prisoner often lost interest in institutional opportunities because he was serving his current sentence without knowing what additional sentences may be imposed on him or if and when he would be able to employ the education and skills developed while in prison.[14] *Mauro,* 436 U.S. at 353, 98

---

**12.** We also note that the Uniform Criminal Extradition Act, Ind.Code § 35–33–10–3. (1988), serves a similar purpose. Pursuant to the Extradition Act, "it is the duty of the governor to have arrested and delivered up to the executive authority of any other state of the United States any person charged in that State with treason, a felony, or other crime who has fled from justice and is found in this State." Ind.Code § 35–33–10–3(2). The demand for the extradition of a person charged with a crime in another state must be in writing and accompanied by a copy of an indictment found or by an information supported by affidavit in the State having jurisdiction of the crime. Ind.Code § 35–33–10–3(3).

**13.** Ind.Code § 35–33–10–4 (1988) defines "sending state" as "a state in which a prisoner is incarcerated at the time he initiates a request for final disposition pursuant to Article 3 of this section or at the time that a request for custody or availability is initiated pursuant to Article 4 hereof." "Receiving state" means the state in which trial is to be had on an indictment, information or complaint pursuant to Article 3 or Article 4 of the IAD, discussed in the text *infra*.

**14.** *See United States ex. rel. Esola v. Groomes,* 520 F.2d 830, 837 (3d Cir.1975) ("psychological strain resulting from uncertainty about future sentence decreases an inmate's desire to take advantage of institutional opportunities"); *Smith v. Hooey,* 393 U.S. 374, 379, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969).

S.Ct. 1834 (quoting H.R.Rep. No. 91–1018, p. 3 (1970); S.Rep. No. 91–1356, p. 3 (1970), U.S.Code Cong. & Admin.News 1970, pp. 4864, 4866).

As a result of the problems created by the use of detainers, the federal government and all the states that adopted the IAD determined that the primary purpose of the IAD would be to "provide for expeditious disposition of all outstanding charges which may affect the conditions or duration of imprisonment and treatment," and also to prescribe procedures by which a state may obtain a prisoner incarcerated in another state. Interstate Agreement on Detainers Act, 18 U.S.C.A., pp. 1395–1398 (1976 ed.), Art. I. *See Mauro,* 436 U.S. at 351, 98 S.Ct. 1834; *Greenwood,* 665 N.E.2d at 583; *Webb v. State,* 437 N.E.2d 1330, 1332 (Ind.1982). The IAD also "provide[s] cooperate procedures among member states to facilitate such disposition." *Mauro,* 436 U.S. at 351, 98 S.Ct. 1834.

The central provisions of the IAD are contained in Articles 3 and 4. Article 3 establishes a procedure by which a prisoner against whom a detainer has been lodged can demand a speedy disposition of the charges. If the prisoner makes such a request, the prisoner must be brought to trial within 180 days after the prisoner causes to be delivered to the prosecuting officer and the appropriate court written notice of imprisonment and request for final disposition of the charges.

Article 4 provides the means by which a prosecutor can obtain temporary custody of a defendant in order to dispose of outstanding charges. Under Article 4, the prisoner must be brought to trial within 120 days "of the arrival of the prisoner in the receiving state." If the prisoner is not brought to trial within the allotted time periods or the prisoner is returned to the "sending state" without bringing the prisoner to trial, the charges will be dismissed with prejudice. This is often referred to as the "anti-shuffling" provision.

The statute providing for Writs is less complex than the statute providing for the IAD, but is deeply rooted in history. The Writ[15] has origins dating back to the first Judiciary Act, 1 Stat. 81, § 14 (1789),[16] and it has always served as a means by which to bring a prisoner from a foreign jurisdiction to another jurisdiction for criminal prosecution of outstanding charges.[17]

Although § 14 did not expressly state that the courts could issue ad prosequendum writs, the Court in an opinion by Mr. Chief Justice Marshall, *Ex parte Bollman,* [8 U.S.] (4 Cranch) 75, 2 L.Ed. 554 (1807), interpreted the words "habeas corpus" as being a generic term including the writ necessary to remove a prisoner in order to prosecute him in the proper jurisdiction wherein the offense was committed. *Carbo [v. United States],* 364 U.S. [611], 615, 81 S.Ct. [338], 341, 5 L.Ed.2d 329 [ (1961) ]

15. A Writ is a certificate "addressed to the attorney general of the United States, certifying that such defendant has been charged by indictment or information filed against him in the specified court with the offense or offenses alleged therein, and that attendance of the defendant in such court for the purpose of criminal prosecution thereon is necessary in the interest of justice and requesting the attorney general of the United States to cause such defendant to be produced in such court, under custody of a federal public servant, upon a designated date and for a period of time necessary to complete the prosecution." Ind.Code § 35–33–10–5(2) (1988).

16. Section 14 of the First Judiciary Act gave authority to

"all the * * * courts of the United States * * * to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and

agreeable to the principles and usages of law. And * * * either of the justices of the supreme court, as well as judges of the district courts, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment.—Provided, That writs of habeas corpus shall in no case extend to prisoners in gaol, unless where they are in custody, under or by colour of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." 1 Stat. 81–82 (1789).

*Carbo v. United States,* 364 U.S. 611, 614, 81 S.Ct. 338, 5 L.Ed.2d 329 (1961).

17. "The writ is ... a procedural device used by a prosecutor who is actively seeking a disposition of pending criminal charges, not merely attempting to hold the defendant for some future date." *People v. Squitieri,* 91 Misc.2d 290, 397 N.Y.S.2d 888, 891 (N.Y.1977).

(emphasis omitted). Since the time of *Ex parte Bollman,* the statutory authority of federal courts to issue writs of habeas corpus ad prosequendum to secure the presence, for purposes of trial, of defendants in federal criminal cases, including defendants then in state custody, has never been doubted. *Mauro,* 436 U.S. at 357–58, 98 S.Ct. 1834.[18] The Supreme Court in *Carbo* held that "there is no indication that there is required today a more restricted view of the writ of habeas corpus ad prosequendum than was necessary in 1807 when Chief Justice Marshall considered it." *Carbo,* 364 U.S. at 620, 81 S.Ct. 338. Additionally, the applicability of the Writ has not been superseded by the creation of the IAD. The Supreme Court recognized that when Congress drafted the IAD it "was well aware of the use of such writs by the Federal Government to obtain state prisoners and that when it used the word 'detainer,' it meant something quite different from a writ of habeas corpus ad prosequendum." *Mauro,* 436 U.S. at 361, 98 S.Ct. 1834.

In *Mauro,* the Supreme Court elaborated on three main differences between detainers and Writs. *Mauro,* 436 U.S. at 358, 98 S.Ct. 1834. First, a Writ may only be issued by a court, whereas a detainer may be lodged against a prisoner either upon the initiative of a prosecutor or law enforcement officer. *Id.* Second, a Writ requires the immediate presence of the prisoner but a detainer merely notifies prison authorities that the prisoner is wanted in another jurisdiction upon release to face pending criminal charges. *Id.* If a detainer is lodged, the receiving state must take further action in order to obtain temporary custody over the prisoner. Finally, because a Writ requires immediate action, it is valid only for a short period of time. On the other hand, a detainer may remain lodged against the prisoner for a lengthy period of time, even for the span of the prisoner's sentence. *Id.*

■ The decision of whether to use a detainer or a Writ to obtain custody of a prisoner only arises when the prisoner is confined in a federal prison; Writs are not available with respect to prisoners incarcerated or confined in other states.[19] Ind.Code § 35–33–10–5.

### B

■ Under the circumstances of this case, we find that the Writ statute, and not the IAD statute, was controlling. Upon the State's request, the Clark County court is-

---

18. For a more detailed description of the historical evolution of the writ of habeas corpus ad prosequendum, see *Carbo v. United States,* 364 U.S. 611, 81 S.Ct. 338, 5 L.Ed.2d 329 (1961).

19. There are advantages and disadvantages to the State's use of either detainers or writs in obtaining prisoners in federal custody. The primary disadvantage of using a detainer is that the IAD contains the anti-shuffling provision. Use of a Writ does not present such a problem and thus when custody of a prisoner is obtained through a Writ, the prisoner may be transported back and forth between jurisdictions.

Another disadvantage of using a detainer, although minor, is that a prisoner may challenge the "legality of his delivery" to the receiving state. Ind.Code § 35–33–10–4, Art. 4(d). The statute providing for the use of Writs does not establish any such rights for the prisoner.

The primary advantage to the State of utilizing detainers is that a uniform procedure under the IAD exists and both sending and receiving states (and the federal government) must comply with the procedures. On the other hand, Writs can only be issued to obtain custody of defendants confined in federal prison. *See* Ind.Code § 35–33–10–5 (permitting the use of Writs only for prisoners confined in federal prisons or institutions). Additionally, the United States Supreme Court has held that state courts lack jurisdiction to issue Writs to order the production, or otherwise interfere, with prisoners in federal custody. *Ableman v. Booth,* 62 U.S. 506, 523–24, 21 How. 506, 16 L.Ed. 169 (1859). This principle has been reaffirmed on several occasions. *See Comm. of Puerto Rico v. Perez Casillas,* 624 F.Supp. 822, 830 n. 5 (D.P.R.1985). However, the federal government may, based on principles of comity, honor state-issued Writs. *See Ponzi v. Fessenden et al.,* 258 U.S. 254, 261–62, 42 S.Ct. 309, 66 L.Ed. 607 (1922); *People v. McLemore,* 411 Mich. 691, 311 N.W.2d 720, 721 (1981); *Runck v. State,* 497 N.W.2d 74, 80 n. 3 (N.D. 1993). This is apparently what happened here.

Another advantage of using detainers is that they can be lodged against a prisoner relatively easily because they can be filed by either a prosecutor or law enforcement official and do not need to be authorized by a court. Writs, on the other hand, can only be issued by a court in which the criminal action against the prisoner is pending.

sued a Writ on two occasions. There is no indication that a detainer was ever lodged against the defendant nor is there any indication that the State intended a Writ to serve as a detainer.

The facts of this case are similar to the facts of one of the cases disposed of by the landmark decision in *Mauro*. 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329. In *Mauro*, federal authorities were granted two Writs which directed the wardens of the state prison to produce two defendants for prosecution in federal court. Because of the overcrowded conditions in the federal court, the defendants were returned to their respective state prisons. Several months later, the defendants were again removed from state prison and taken into federal custody pursuant to a Writ. The defendants moved to dismiss the charges on the grounds that the anti-shuffling provisions of the IAD had been violated.

In holding that dismissal was not appropriate, the United States Supreme Court held that "a writ issued by a federal court to state authorities, directing the production of a state prisoner for trial on criminal charges, is not a detainer within the meaning of the [IAD] and thus does not trigger the application of the [IAD]." *Mauro*, 436 U.S. at 349, 98 S.Ct. 1834. *See Flick v. Blevins*, 887 F.2d 778, 781 (7th Cir.1989); *McLemore*, 311 N.W.2d at 721; *People v. Befeld*, 90 Ill. App.3d 772, 46 Ill.Dec. 110, 413 N.E.2d 550, 552 (1980). "[T]he provisions of the [IAD] are triggered only when a 'detainer' is filed with the custodial (sending) State by another State (receiving) having untried charges pending against the prisoner." *Mauro*, 436 U.S. at 343, 98 S.Ct. 1834.

■ Although the watershed decision rendered in *Mauro* set forth that Writs are not detainers which invoke the application of the IAD, it is notable that *Mauro* dealt exclusively with Writs issued by federal courts. However, "[t]he decision in *Mauro* has been

followed regardless of whether the writ emanated from federal or state court." *McLemore*, 311 N.W.2d at 721 (footnote containing citations omitted). *See Runck*, 497 N.W.2d at 80. Because there appears to be little reason for distinguishing between Writs issued by federal and state courts, we hold this to be the law in Indiana.

Pursuant to Ind.Code § 35–33–10–5, courts in Indiana have statutory authority to issue Writs to secure the presence of prisoners in federal custody for purposes of criminal prosecution. The State requested the issuance of a writ both in 1992 and in 1994, but never requested that a detainer be lodged against defendant. The trial court found, "No evidence has been presented that the State of Indiana ever filed a detainer so as to trigger the requirements of the I.A.D. In the absence of such proof, the I.A.D. simply does not apply." (R. at 87.)

Defendant, however, claims that "the IAD is the exclusive means to secure the presence of a defendant for purposes of prosecution." Br. of Appellant at 14. Defendant's contention is clearly mistaken. First, Indiana has definitively denominated two methods of securing the presence of defendants who are in the custody of foreign jurisdictions—the IAD pursuant to Ind.Code § 35–33–10–4 and the Writ set forth in Ind.Code § 35–33–10–5.[20] Second, as we discussed *supra*, the Writ has continued to be accepted as a proper procedure for securing the presence of prisoners for criminal prosecution. *See Mauro*, 436 U.S. at 358, 98 S.Ct. 1834 ("The role and functioning of the ad prosequendum writ are rooted in history, and they bear little resemblance to the typical detainer which activates the provisions of the [IAD]."). *See also McLemore*, 311 N.W.2d at 721 ("The decision by federal authorities to honor a writ in the absence of a detainer as a matter of comity does not trigger the provision of the [IAD]."); *Flick*, 887 F.2d at 778.[21] And finally, a Writ

---

**20.** There have been only a handful of cases where the State has used a Writ as the exclusive means of obtaining temporary custody of a prisoner confined in a federal prison. In none of these cases did the defendant challenge the validity of the Writ. *See, e.g., Shropshire v. State*, 501 N.E.2d 445, 446 (Ind.1986); *Weatherford v. State*, 164 Ind.App. 340, 328 N.E.2d 756, 758 (1975),

overruled on other grounds by *Holland v. State*, 265 Ind. 216, 352 N.E.2d 752, 762 (1976); *Smith v. State*, 165 Ind.App. 37, 330 N.E.2d 384, 388 (1975).

**21.** See the following cases which were decided before *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978): *Morgan v.*

does not constitute a detainer for purposes of the IAD. This is true regardless of whether the Writ is issued by a state or federal court.

For the foregoing reasons, we find that the Writ statute and not the IAD statute was applicable in this case. Consequently, the anti-shuffling provision of the IAD was never implicated and defendant was not entitled to dismissal on that basis.[22]

### III

Defendant contends that he was denied his constitutional and statutory right to a speedy trial under U.S. Const. Amend. VI,[23] Ind. Const. art. I, § 12,[24] and Ind.Crim.Rule 4(C).[25]

### A

■ When reviewing a claim for a violation of the right to a speedy trial, we ordinarily begin our analysis with Crim.R. 4. This is because "Crim.Rule 4 generally implements the constitutional right of a criminal defendant to a speedy trial, thereby establishing time limits and providing for discharge in the event that limits are exceeded." *Bridwell v. State*, 659 N.E.2d 552, 553 (Ind.

1995). *See Austin v. State*, 682 N.E.2d 1287, 1288 (Ind.1997); *Joyner v. State*, 678 N.E.2d 386, 391 (Ind.1997). Before determining whether Crim.R. 4(C) was violated, we must first determine whether the rule applies to the circumstances of this case. We hold that it does.

### A–1

The State contends that Crim.R. 4(C) does not apply because defendant was incarcerated in a foreign jurisdiction at the time the present charges were filed. Instead, the State contends that the IAD applies for purposes of speedy trial rights and relies on *Brown v. State*, 497 N.E.2d 1049 (Ind.1986), for this contention. We believe the State misapplies *Brown*.

In *Brown*, the defendant was charged in Indiana and was released on bond. Two days later, defendant was arrested in Kentucky and served approximately a one year sentence before being returned to Indiana. We concluded in *Brown* that the IAD, rather than Crim.R. 4(C), governs the speedy trial rights of a defendant incarcerated in another jurisdiction. *See Williams v. State*, 533

---

*United States*, 380 F.2d 686 (9th Cir.1967) ("A writ of habeas corpus ad prosequendum is the correct way to bring a prisoner under incarceration by state and federal courts to trial for alleged violations of laws."); *Lawrence v. Willingham*, 373 F.2d 731 (10th Cir.1967) ("A writ of habeas corpus ad prosequendum is a necessary tool for jurisdictional potency.").

**22.** Defendant relies on *Webb v. State*, 437 N.E.2d 1330 (Ind.1982), to support his proposition that even if the State properly used the writ to obtain custody of defendant, the anti-shuffling provision of the IAD applies in this case. Defendant's contention is based upon our conclusion in *Webb* wherein we stated that the "writ of habeas corpus ad prosequendum is a 'written request for temporary custody' within the meaning of Article 4 of the IAD." *Webb*, 437 N.E.2d at 1331. This was true in *Webb* because the State initially filed a detainer against the defendant while he was serving a sentence in a federal prison, thus invoking the IAD. The detainer only served as a notice to federal prison authorities that defendant was wanted by Indiana to face pending criminal charges. In order to actually obtain temporary custody of defendant, a written request had to be made which in this case was done by utilizing a Writ. Consequently, only because a detainer was initially lodged was the Writ considered a "written request for temporary custody" within the meaning of the IAD. On the

other hand, if a detainer had never been lodged, the issuance of the Writ would not have invoked the IAD. *See United States v. Mauro*, 436 U.S. 340, 361, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). Therefore, the circumstances in *Webb* were sufficiently different from this case so as not to control its disposition.

**23.** The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...."

**24.** Indiana Const. art. I, § 12 provides, in part: "Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

**25.** Ind.Crim.Rule 4(C) provides:

No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of this arrest on such charge, whichever is later, except where a continuance was had on his Motion or the delay was caused by his act, or where there was not sufficient time to try him during such period because of the congestion of the court calendar....

N.E.2d 1193, 1195 (Ind.1989) ("Ind.R.Cr.P. 4 does not apply when the IAD statute is applicable. *Brown v. State* (1986), Ind., 497 N.E.2d 1049."). This conclusion was based on *Heflin v. State*, 275 Ind. 197, 416 N.E.2d 121 (1981), where the IAD applied because a detainer had been lodged. In *Heflin*, after Indiana authorities placed a detainer on a defendant in federal prison, the defendant filed a motion for a speedy trial and later filed a motion to dismiss for a denial of his constitutional right to a speedy trial, but not a violation of Crim.R. 4(B). On appeal from the denial of post-conviction relief, defendant asserted that appellate counsel was ineffective for not raising or preserving for appeal the issue of Crim.R. 4(B). We held that since defendant was imprisoned in another jurisdiction, his request for a speedy trial triggered the application of the IAD. *Id.* at 124. *Cf. United States v. Castor*, 937 F.2d 293, 296 (7th Cir.1991) (detainee awaiting trial in local jail does not have a sufficient interest in the confining institution's rehabilitative programs to justify invocation of the IAD). Our holding in *Heflin* should have been more precise. In fact, the IAD was applicable for purposes of a speedy trial because a detainer had been lodged and not simply because the defendant was in a foreign jurisdiction. *See, e.g., McLemore*, 311 N.W.2d at 721 ("Since the prosecution in the instant case obtained temporary custody as a result of the writ and no detainer had been lodged against the defendant, the time provision for trial in Article IV(c) [of the IAD] is inapplicable.").

■ *Heflin* stated that "it is irrational to extend the application of Criminal Rule 4(B) to a defendant who is incarcerated in another jurisdiction." *Id.* at 124 (citing *Smith v. State*, 267 Ind. 167, 368 N.E.2d 1154 (1977)). However, the inapplicability of Criminal Rule 4 to defendants in foreign jurisdictions should not extend to defendants who are brought into Indiana under Writs or other forms of temporary custody. This court has determined that defendants in Indiana criminal prosecutions have certain speedy trial rights which we have embodied in Criminal Rule 4. Where the legislature has prescribed an alternate set of time deadlines as part of a broader statutory scheme as it has done in the IAD, we properly subordinate Criminal Rule 4 thereto. But where the state elects not to invoke the IAD for purposes of securing a defendant's presence at trial, it cannot invoke selectively provisions of the IAD that it finds to its liking. Defendant here is entitled to the protections of Criminal Rule 4.

### A–2

We now look to see whether the State complied with Crim.R. 4(C) and brought defendant to trial within one year. The one year period begins with the date criminal charges are filed against the defendant or with the arrest of defendant, whichever is later. Crim.R. 4(C). "If a defendant seeks or acquiesces in any delay which results in a later trial date, the time limitations of the rule are also extended by the length of those delays." *Isaacs v. State*, 673 N.E.2d 757, 762 (Ind.1996). *See Ferguson v. State*, 594 N.E.2d 790, 792 (Ind.1992).

■ Defendant was charged in August of 1992, and on October 8, 1992, the Clark Circuit Court granted the first Writ. Defendant was transported to the Clark Circuit Court and arraigned on November 9, 1992.[26] Defendant being brought to Indiana is equivalent to an "arrest" and thus the one year period for determining a violation of Crim.R. 4(C) commences on November 9, 1992.[27] After the court granted defendant's Motion to Quash the Writ, the State dismissed the charges on April 22, 1993. In

---

**26.** Defendant does not advise us as to when he was transported to Indiana and does not direct our attention to an order contained in the record providing for his transfer. The record does contain defendant's September 19, 1995, Verified Petition for Writ of Mandamus and/or Prohibition requesting this Court to dismiss defendant's case with prejudice which stipulates that defendant was brought to the State of Indiana on November 9, 1992. (R. at 243.) Although we denied defendant's Petition, we presume the facts set forth in the Petition are correct.

**27.** We also note that defendant's speedy trial rights in Indiana do not commence until he is within the jurisdiction and exclusive control of Indiana authorities. *See* text in part III–A–1 and *Heflin v. State*, 275 Ind. 197, 201, 416 N.E.2d 121, 124 (1981).

holding the State responsible for the time elapsed between defendant's "arrest" and the dismissal of the charges, 165 days is charged to the State.

▮▮▮▮▮ On March 30, 1994 the State refiled the charges against the defendant and was granted the second Writ on August 1, 1994. The defendant was transported to Clark County on August 15, 1994. Dismissing and refiling charges does not reset the speedy trial clock—it merely tolls it for the actual days between dismissal and refiling. *Hornaday v. State*, 639 N.E.2d 303, 307 (Ind. Ct.App.1994). *See Goudy v. State*, 689 N.E.2d 686, 691 (Ind.1997); *Young v. State*, 521 N.E.2d 671, 673 (Ind.1988). However, the speedy trial time does not re-commence on the date charges were refiled because, as we stated *supra*, Crim.R. 4(C) sets forth that the speedy trial clock commences "from the date the criminal charge against [ ] defendant is filed, or from the date of his arrest on such charge, whichever is later." *See Crawford v. State*, 669 N.E.2d 141, 145 (Ind.1996) ("defendant's speedy trial rights do not attach until the filing of a formal indictment or information or until actual restraints are imposed by an arrest and holding to answer a criminal charge"); *Goudy*, 689 N.E.2d at 691 (because defendant was absent from the jurisdiction when charges were refiled, "the speedy trial clock did not begin to run again until defendant was again held in jail in Indiana"). Consequently, for purposes of calculation, the speedy trial clock re-commences on August 15, 1994, the date defendant was returned to Indiana, and not March 30, 1994, the date the charges were re-filed. Again, defendant's transportation to Indiana is the equivalent of an arrest. On September 21, 1994, the defendant filed a motion for a speedy trial and thus, trial was set for November 15, 1994.[28] On November 15, 1994, the defendant joined the State in a motion for continuance of the trial. The defendant

requested that trial be continued indefinitely until either the Indiana Supreme Court or the Indiana Court of Appeals issued a final opinion on his interlocutory appeal.[29] Additionally, the defendant stated in this motion that he "withdraws his motion for a speedy trial, waives his right to a speedy trial, and recognizes that any and all delays between the filing of this Motion and the next scheduled trial date following his interlocutory appeal, are attributable to him and not the State of Indiana." (R. at 135–36.) We charge the State with 93 days which elapsed between August 15, 1994 (the re-arrest), and November 15, 1994 (joint motion for a continuance), bringing the total expired time to 258 days.

The Court of Appeals refused to accept the interlocutory appeal on February 6, 1995, and the trial date was thereafter set for April 11, 1995.[30] On March 28, 1995, the defendant, along with the State, filed a joint motion seeking to continue the trial indefinitely and attributing the delays to defendant. The trial court granted the motion. The State is not charged with any time between the November 15, 1994, filing of the motion for a continuance and March 28, 1995, because of defendant's concession that all delays would be attributable to him. *See Spann v. State*, 681 N.E.2d 223, 226 (Ind.Ct.App.1997) ("A defendant is responsible for any delay caused by his action including seeking or acquiescing in any continuance.").

▮▮▮▮ On June 6, 1995, the trial court set the jury trial for October 3, 1995. Defendant did not object to this trial date nor did defendant at this time request a speedy trial. On July 14, 1995, the defendant filed a motion to dismiss for a violation of Crim.R. 4(C) (R. at 234) and a hearing was held on this matter on September 11, 1995. The trial court denied the motion to dismiss. Defendant contends that the filing of a motion to

---

28. We note that the court did set trial within 70 days as required by Ind.Crim.Rule 4(B).

29. Defendant appealed the trial court's denial of his motion to quash the second writ. (R. at 135.)

30. The trial date was set within the 70 days contemplated by Crim.Rule 4(B). Because defendant did not re-assert his desire for a speedy

trial, this was not required. *See Wheeler v. State*, 662 N.E.2d 192, 194 (Ind.Ct.App.1996) ("When a defendant requests an indefinite continuance and later becomes dissatisfied that his trial has not been reset, he must take some affirmative action to notify the court that he now desires to go to trial to reinstate the running of the time period.").

dismiss was a request for a speedy trial. We have held before that a motion to dismiss for a violation of the right to a speedy trial is an assertion of a defendant's right. *Crawford*, 669 N.E.2d at 150 (failure of defendant to timely move to have case dismissed, on grounds that state violated 180 day period provided by IAD for final disposition of charges, waives that right). However, defendant already waived his right to a speedy trial when he failed to object on June 6, 1995, to the trial court's decision to set trial for October. "Once a trial date is set beyond the one-year limit provided for in Crim.Rule 4(C), the defendant must file a timely objection to the trial date or waive his right to a speedy trial." *Randall v. State*, 455 N.E.2d 916, 922 (Ind.1983). *See Wheeler v. State*, 662 N.E.2d 192, 194 (Ind.Ct.App.1996). Additionally, "when defendant asks for a continuance, the time between the motion for a continuance and new trial date is chargeable to defendant." *Henderson v. State*, 647 N.E.2d 7, 12–14 (Ind.Ct.App.1995). *See Wheeler*, 662 N.E.2d at 194. This would comprise the time which elapsed from March 28, 1995 (joint motion for a continuance), to October 3, 1995 (new trial date). And finally, on September 19, 1995, the defendant filed a motion to stay proceedings and continue the trial date in order to pursue a Petition for Writ of Mandamus and/or Prohibition.[31] The motion was granted with delays chargeable to defendant. We denied the Petition on October 12, 1995. The trial eventually occurred on November 14, 1995, with defendant being found guilty on November 21, 1995, and being sentenced on December 20, 1995. In totality, the State is charged with causing trial to be delayed by 258 days, which is well within the one year time limitation of Crim.R. 4(C). Consequently, defendant was not denied his statutory right to a speedy trial.

### B

■ We next turn to whether defendant was deprived of his right to a speedy trial under the Indiana and United States Constitution. In reviewing claims of speedy trial rights, Indiana and federal courts apply the analysis established in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *See Lee v. State*, 684 N.E.2d 1143, 1146 (Ind.1997) (citations omitted). The *Barker* analysis employs four factors: (1) length of delay, (2) defendant's assertion of his right, (3) the government's reason for the delay, and (4) the prejudice to the defendant. *Barker*, 407 U.S. at 530, 92 S.Ct. 2182.

■ The defendant was first charged on August of 1992 and eventually brought to trial on November 14, 1995. As stated in part A–2 *supra*, the State was charged with delaying the trial for 256 days. Because defendant was brought to trial within one year as prescribed by Crim.R. 4(C), the length of the delay was not unreasonable. *See Lee*, 684 N.E.2d at 1146 (delay not unreasonable since defendant was brought to trial in less than six months as required by Crim.R. 4(A)).

■ Defendant must assert his right to a speedy trial before claiming a constitutional violation. Our review of the record suggests that defendant did request a speedy trial on several occasions. However, we also recognize that on one occasion defendant waived his right to a speedy trial after filing a joint motion for a continuance and that on several occasions was the protagonist of the delays by engaging in the following actions: (1) filing several other motions for continuances; (2) seeking an interlocutory appeal; and (3) filing a Verified Petition for Mandamus and/or Prohibition. Additionally, when the trial date was set on June 6, 1995 for October 3, 1995, defendant did not object to the trial date nor did defendant at that time request a speedy trial. Defendant's attempts to assert his right to a speedy trial were insufficient.

We do not find that the State unreasonably delayed the trial. As discussed earlier, after the trial court granted the motion to quash the first Writ, the State dismissed the charges against defendant. Thus, a majority of the delay (165 days) that was charged to the State related to the skirmishing over the

---

**31.** In the Verified Petition for Writ of Mandamus and/or Prohibition, defendant claimed (1) the anti-shuffling provision of the IAD had been violated and (2) defendant's right to a speedy trial under Indiana Crim.Rule 4(C) had been violated. (R. at 245–46.)

first Writ. The only other delay charged to the State was 91 days attributable to the time between re-arresting defendant and defendant's motion to continue the trial date. We do not find that the State engaged in any actions with the purpose of delaying trial.

■ The final factor in the *Barker* test, prejudice, is assessed in light of the three interests which the right to a speedy trial was designed to protect: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532, 92 S.Ct. 2182. *See Lee*, 684 N.E.2d at 1146 (citing *Scott v. State*, 461 N.E.2d at 143; *Lahr v. State*, 615 N.E.2d 150, 153 (Ind.Ct. App.1993)). "Indiana courts have placed the burden of demonstrating actual prejudice on the defendant to prove a speedy trial deprivation." *Lee*, 684 N.E.2d at 1146 (quoting *Scott*, 461 N.E.2d at 143; *Lahr*, 615 N.E.2d at 153).

■ The only prejudice which defendant asserts that he suffered was an impairment of his defense. Defendant contends that he suffered a "presumptive prejudice" as described in *Harrell v. State*, 614 N.E.2d 959 (Ind.Ct.App.1993), or at least a palpable prejudice. Br. of Appellant at 17. In *Harrell*, the Court of Appeals stated that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* at 965. Because we do not find that the delay in bringing defendant to trial was excessive, the *Harrell* standard of "presumptive prejudice" is not applicable. Additionally, in *Harrell*, the defendant submitted evidence of actual impairment. In this case, defendant merely asserts that he was prejudiced because "evidence sought to be presented with regard to a blue van or other people who might have wanted to kill [the victim] were not able to be produced after the delay caused by the State." Br. of Appellant at 17. Defendant has not provided us with what evidence would have been available but for the delay or by what means the delay prevented him from presenting this asserted

evidence. Consequently, defendant has not proved that his defense was impaired.

As none of the *Barker v. Wingo* factors point in defendant's favor, we conclude that defendant was not deprived of his right to a speedy trial under either the Sixth Amendment to the United States Constitution or art. I, § 12, of the Indiana Constitution.

## IV

Defendant contends that the trial court erred in denying his motion to suppress statements provided by him regarding the location of the victim's body. Defendant presents three reasons supporting his claim: (1) defendant was not advised of his *Miranda* rights and the State failed to present evidence that defendant waived his Fifth Amendment rights; (2) defendant was provided with use immunity for the statements; and (3) defendant's trial counsel were ineffective for giving him the impression that he had use immunity.

As detailed in *Background, supra*, defendant was charged with two federal crimes which could have resulted in a sentence of a minimum of 30 years to a maximum of life imprisonment. The federal officials offered defendant a plea agreement whereby they would recommend a sentence reduction if defendant would provide the federal officials with certain kinds of information, the most relevant to this case being the location of Danny Guthrie's body. After this proposal was made, defendant's attorneys telephoned the Clark County prosecutor to advise the prosecutor of the agreement which had been offered by the federal officials, and asked if the prosecutor would give the defendant "use immunity" for any statements which were provided. What happened next is disputed. Defense counsel testified that, based on the fifteen minute telephone conversation, it was absolutely clear that a use immunity agreement existed. One of the attorneys advised defendant that any statements he made regarding the whereabouts of Guthrie's body could not be used against him in a criminal prosecution. Defendant then provided federal officials and a Clark County detective [32]

---

**32.** Detective Kramer observed and listened to

defendant's statements via a closed circuit televi-

with his recollection of the events leading up to Guthrie's death. These facts are provided in *Background, supra.*

A

Defendant contends that because the State failed to advise him of his *Miranda* rights, the statements he provided regarding the location of the victim's body were inadmissible. The record reflects indisputable evidence that defendant was in federal custody and indeed was not advised of his Miranda rights. However, under the circumstances of this case, we find that it was unnecessary for defendant to be advised of his *Miranda* rights.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court established several broad prophylactic rights in order to protect citizens interrogated while in custody. *See Allen v. State*, 686 N.E.2d 760, 769 (Ind.1997). *Miranda* requires that defendants be advised of their right to an attorney, their right to remain silent, that their statements may be used against them in a court of law, and that the State will provide them with an attorney if they cannot afford one. *Allen*, 686 N.E.2d at 769. "The purpose of requiring the Miranda warnings before custodial interrogation is to combat state-sanctioned coercion." *Id.* However, the warnings required by *Miranda* are "in the absence of a fully effective equivalent." *Miranda*, 384 U.S. at 444, 478, 86 S.Ct. 1602. *See Poulton v. State*, 666 N.E.2d 390, 392 (Ind.1996). In this case, we believe that an equivalent to the advisement of *Miranda* rights existed. Defendant had two of his lawyers present when he provided the statements which he now wishes to suppress. Irrespective of the fact that the defense attorneys encouraged defendant to provide certain statements to federal authorities to solidify a plea agreement, certainly these attorneys advised defendant of his rights [33] and protected defendant from being coerced by the State. Under these circumstances, we

find no error in the State's failure to advise defendant of his *Miranda* rights.

B

Defendant next contends that even if the *Miranda* warnings were unnecessary under the circumstances of this case, the statements which defendant provided were inadmissible because they were made under the belief that the State had granted him use immunity. The trial court determined that there was a misunderstanding between the defense counsel and the State and that in fact no use immunity existed. We agree with the trial court's finding.

Use immunity is a procedural tool utilized by prosecutors to encourage or force reluctant witnesses to testify. Under Ind. Code § 35–37–3–3 (1988), only the prosecutor may request immunity for witnesses in criminal prosecutions and only the trial court may grant such immunity. *See Lucas v. State*, 499 N.E.2d 1090, 1094 (Ind.1986).

In *Rihl v. State*, 413 N.E.2d 1046, 1053 (Ind.Ct.App.1980), the court looked at three factors in determining whether to enforce an immunity agreement with the State: (1) the involvement of the prosecutor; (2) at least nominal approval by the court; and (3) some detriment to the defendant by the State's failure to abide by its bargain. The record reflects that the prosecutor was involved in discussions relating to the possibility of granting defendant use immunity. However, the prosecutor never definitively articulated that an agreement existed and that defendant would be provided immunity. During a hearing on defendant's motion to suppress certain statements, defense counsel provided the following testimony in an attempt to explain his belief that use immunity existed:

"... he indicated he would prosecute Mr. Sweeney if he was able to obtain independent information which would justify the prosecution. Now my understanding of that portion of the conversation would have been that we had the use immunity agree-

---

sion located in the interrogation room.

**33.** One of the detectives testified that defendant's attorneys informed at least him that they had advised defendant of his rights. (R. at 715–16.)

ment.... He did manifest an interest in prosecuting, but my understanding was it would be on the basis of discovering evidence other than that might come out of a statement from Mr. Sweeney." (R. at 608.)

On the basis of this conversation, defense counsel informed the defendant that he had use immunity for anything he said concerning the Guthrie incident. However, defense counsel did advise the defendant that this agreement was not in writing but that it was clearly his understanding that an agreement existed.[34] We agree with the trial court's finding that the prosecutor's statements do not suggest that he was offering defendant use immunity. The prosecutor was stating just the obvious—that he would have to discover more evidence to corroborate defendant's statements rather than just solely rely on information provided by defendant. In Indiana, in order for a confession to be introduced at trial, the State must produce corroborating or independent evidence of the corpus delicti.[35] *Johnson v. State,* 653 N.E.2d 478, 479 (Ind.1995) (citing *Willoughby v. State,* 552 N.E.2d 462, 466 (Ind.1990)).

The record reflects no court approval or supervision of the asserted use immunity agreement. *See generally Everroad v. State,* 571 N.E.2d 1240, 1243 (Ind.1991). Because defendant has failed to prove the first two factors, we find it unnecessary to discuss the third factor—detriment to defendant. However, a discussion of whether defendant suffered any prejudice is set forth in detail, *infra.*

## C

▮▮▮▮ Defendant finally contends that, if he was not entitled to *Miranda* advisements and if use immunity was not granted, at least he was denied the effective assis-

tance of counsel. We analyze claims of ineffective assistance of counsel according to the two-part test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, e.g., Canaan v. State,* 683 N.E.2d 227, 229 (Ind.1997); *Lowery v. State,* 640 N.E.2d 1031, 1041 (Ind. 1994). First, defendant must show that, in light of all the circumstances, counsel's performance was outside the wide range of professionally competent assistance. *Canaan,* 683 N.E.2d at 229 (citing *Lowery,* 640 N.E.2d at 1041). In order to make such a showing, defendant must demonstrate that counsel's performance was unreasonable under prevailing professional norms. *Id.* Second, the defendant must show adverse prejudice as a result of the deficient performance. *Id.* This requires a demonstration that counsel's performance was so prejudicial that it deprived the defendant of a fair trial. *Id.* There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bellmore v. State,* 602 N.E.2d 111, 123 (Ind.1992). An appellant must present strong and convincing evidence to rebut that presumption. *Duncan v. State,* 514 N.E.2d 1252, 1253 (Ind.1987).

Defendant's claim of ineffective assistance of counsel is based on the fact that his counsel failed to obtain a writing or recording of the grant of "use immunity." As set forth *supra,* Ind.Code § 35-37-3-3 (1988), indicates that a prosecutor must make a request for a witness to be granted use immunity and only the court can grant such a request. The record suggests that this procedure was not followed. However, we acknowledge the possibility that in some counties, familiarity and trust between the prosecutor and defense attorneys is such that at times informal agreements are entered into.[36] Indeed, in

---

34. According to defense counsel, the prosecutor made it clear that they were not interested in pursuing charges relating to the bombing incident and marijuana cultivation or trafficking. (R. at 607.)

35. See part XI, *infra,* concluding that the State was able to present independent evidence of corpus delicti.

36. *See Everroad,* 571 N.E.2d at 1243 (where an issue was raised concerning the existence of an

immunity agreement and defendant testified that his attorney advised him that "he could trust the prosecutor therefore no written agreement would be needed"); *Bowers v. State,* 500 N.E.2d 203, 204 (Ind.1986) (although there was no granting of "use immunity," the State did make an agreement with defendant that if defendant provided certain information the State would forego criminal charges and the Court enforced the agreement for public policy reasons).

this case, the defense attorney testified as follows: "[I] advised [defendant] that we did not have this in writing, but I had talked with the Prosecuting Attorney, it was clearly my understanding that's what the agreement was, . . . ." (R. at 611.) However common it may be for attorneys to engage in this informal practice of negotiating agreements, we cannot approve extra-judicial "use immunity." In fact, we presume that the legislature's mandate of court supervision for matters relating to "use immunity" and "plea bargaining" was designed to avoid the situation which has arisen here—a misunderstanding over whether a use immunity agreement exists. For this reason, we assume, without deciding, that counsel was deficient for failing to obtain an agreement in writing.

■ The "constitutional guarantee of counsel under the Sixth Amendment has been construed to include four rights: the right to counsel, the right to effective assistance of counsel, the right to a preparation period sufficient to ensure a minimal level of quality of counsel, and the right to be represented by counsel of one's own choice." *United States · v. McCutcheon*, 86 F.3d 187, 189 (11th Cir.1996) (citations omitted). The Sixth Amendment right to counsel attaches when "a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). In *United ed States v. Alvarez*, No. 97–4061, 142 F.3d 1243, 1998 WL 207912 (10th Cir.1998), the defendant, after meeting with a court-appointed attorney at his request, made several incriminating statements to DEA agents in the hope that he would receive a reduced sentence for his cooperation. After being convicted, the defendant claimed his counsel was ineffective for various reasons. The court determined that defendant had no Sixth Amendment right to effective assistance of counsel at the time he was questioned because the government had not initiated formal proceedings. Additionally, the Supreme Court has determined that the Sixth Amendment right to counsel is "offense specific." *McNeil*, 501 U.S. at 175, 111 S.Ct. 2204. The right "cannot be invoked once for all future prosecutions." *Id.* "[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities . . . ." *Id.* at 175–76, 111 S.Ct. 2204 (quoting *Maine v. Moulton*, 474 U.S. 159, 179–80, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)).

■ In this case, although federal charges had been filed, the State had not yet filed charges for the murder of Guthrie. Consequently, defendant's Sixth Amendment right to counsel and, thus, his right to the effective assistance of counsel had not attached when he provided statements regarding the location of Guthrie's body. *See United ed States v. MacDonald*, 966 F.2d 854, 859 n. 9 (4th Cir.1992) (where no Sixth Amendment right to counsel attaches to the proceeding, an ineffective assistance claim cannot be sustained).

## V

Defendant contends that the trial court erred when it denied his motion to suppress a handgun obtained through a warrantless search. As described in *Background, supra*, defendant said he provided this gun to Guthrie and initially buried the gun after finding Guthrie dead. Defendant said he later retrieved the gun for protection. This gun was seized by a Utah police officer. Laboratory testing revealed that defendant's gun was the weapon from which the fatal shot was fired to kill Guthrie. We have reviewed the evidence and affirm the trial court's decision to deny the motion to suppress.

■ The Fourth Amendment [37] protects persons from unreasonable search and

---

**37.** The Fourth Amendment to the United States Constitution provides the following:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the

seizure and this protection has been extended to the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 650, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). As a general rule, the Fourth Amendment prohibits a warrantless search. *Brown v. State*, 691 N.E.2d 438, 443 (Ind.1998) (citing *Perry v. State*, 638 N.E.2d 1236, 1240 (Ind. 1994); *Stallings v. State*, 508 N.E.2d 550, 552 (Ind.1987)). When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search. *Id.* (citing *Stallings*, 508 N.E.2d at 552; *Short v. State*, 443 N.E.2d 298, 303 (Ind.1982)). *See Murrell v. State*, 421 N.E.2d 638, 640 (Ind.1981) (citing *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951) ("Where a search and seizure is effected without a search warrant, the state bears the burden of proving the search fell within one of the well delineated exceptions to the warrant requirement.")). Probable cause and exigent circumstances are recognized exceptions. *Robles v. State*, 510 N.E.2d 660, 664 (Ind.1987).

█ We believe that the circumstances of this case demonstrate that the police officer was well within the bounds of his authority to search and seize defendant's handgun. In support of this finding, we provide the specific facts which led up to the seizure as testified to by Officer Barney.[38]

Officer Barney pulled defendant over for making an improper lane change on Interstate 70. While defendant was pulling over, Officer Barney noted that "the driver [defendant] appeared to lean over as though he was putting something under the seat." (R. at 931.) After coming to a complete stop, "defendant jumped out immediately" and came back to the officer. Officer Barney found defendant to be very nervous and shaking. In light of observing defendant place something underneath the seat, Officer Barney also became nervous. In response to questions posed by Officer Barney, the defendant denied having either firearms or narcotics. Defendant did not respond to Officer Bar-

ney's request to look in the vehicle. At some point, the defendant opened the trunk of his vehicle, and while rifling through a suitcase said, "see, there's no guns or drugs." (R. at 933.) At this point, Officer Barney observed two loaded handgun clips. As a result, Officer Barney returned to his car and ran a check on defendant's personal history and the vehicle. After learning that defendant had an extensive criminal record, the officer searched defendant's vehicle and found a handgun on the passenger's side of the vehicle in the location where he had earlier observed defendant reaching. Defendant was charged with having a loaded firearm in the vehicle and for being a restricted person in possession of a firearm.

█ Officer Barney was justified in stopping defendant's vehicle. *See Walker v. State*, 527 N.E.2d 706, 708 (Ind.1988) (stopping defendant's vehicle for taillight and licence plate light violations was a justified stop); *Taylor v. State*, 273 Ind. 558, 406 N.E.2d 247, 250 (Ind.1980) (initial stop of car for traffic violations was lawful). We also find that defendant impliedly consented to a search of his vehicle by opening the trunk of his car. A valid consent to a search obviates the requirement of a warrant. *State v. Foreman*, 662 N.E.2d 929, 931 (Ind.1996); *Perry v. State*, 638 N.E.2d 1236, 1240 (Ind.1994).

█ Even assuming, without deciding, that defendant's consent to a search of his trunk was not a consent to a search of his entire vehicle, the facts demonstrate that Officer Barney had valid reasons for searching defendant's vehicle without a warrant. An officer is permitted to search for weapons when "he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In this case, the officer noticed defendant lean over as though he was placing something under the seat, defendant was nervous and shaking, the officer observed two loaded handgun clips in the

---

place to be searched, and the persons or things to be seized.

**38.** Officer Barney is employed by the Servier County Sheriff's Department in the State of Utah where the search and seizure took place.

trunk, and finally, the officer learned that defendant had an extensive criminal history. The officer's decision to search the vehicle was reasonable. *See Walker*, 527 N.E.2d at 708 (the officer obtained knowledge of facts which were sufficient to form the basis of probable cause that the defendant was illegally carrying a weapon); *State v. Nixon*, 593 N.E.2d 1210, 1213 (Ind.Ct.App.1992) ("observations of the movements in the front seat of the car and the white packets, coupled with [officer's] knowledge of the ways in which drug sales occur from vehicles, provided the probable cause necessary to effectuate a warrantless, but lawful search …"); *Young v. State*, 564 N.E.2d 968, 970 (Ind.Ct. App.1991) (pat down search of defendant was reasonable where officer was aware that defendant had a prior arrest for possession of a sawed-off shotgun and the search was motivated by safety concerns); *Collett v. State*, 167 Ind.App. 185, 338 N.E.2d 286 (1975) (officer's previous information that defendant carried a gun sufficient to justify pat down search). We affirm the trial court's denial of the motion to suppress the handgun.

## VI

Defendant claims that the trial court erred in quashing his subpoena duces tecum [39] directing Dr. Handy, a pathologist who performed the autopsy on the victim, to produce "all documentation, notes, articles, etc. of [her] investigation of the epidemiology and manner of death in fatal gunshot wounds in Jefferson [sic] County Kentucky, 1982–1989." (R. at 380.) Defendant claims that the quashing of the subpoena denied him the Sixth Amendment right to cross-examine witnesses.

"The decision to enforce, modify, or quash a subpoena duces tecum is a question for the trial court and will not be disturbed unless the decision is clearly arbitrary." *Turpin v. State*, 435 N.E.2d 1, 4 (Ind.1982). *See Norris v. State*, 516 N.E.2d 1068, 1070 (Ind.1987) ("The trial court has discretion in making decisions regarding discovery matters as a part of its inherent power to guide and con-

trol the proceedings."). A court may "quash or modify the subpoena if it is unreasonable and oppressive." Ind.Crim.R. 2(1); Ind. Trial Rule 45(B).

In the hearing on the motion to quash the subpoena duces tecum, the court determined that the subpoena was too broad and not relevant to this case. Additionally, the court advised defendant that "if [the witness] testifies you'll have the right to cross examine her as to her methodology and how she arrives at certain opinions and conclusions and so on and so forth." Defendant has presented us with no reason why the unavailability of Dr. Handy's research prevented defendant from effectively cross-examining her. As such, we find the trial court's decision to quash the subpoena duces tecum to have been reasonable. *See Small v. State*, 632 N.E.2d 779, 786 (Ind.Ct.App.1994) (when the defendant issued a subpoena duces tecum directing the police department to produce "all records and information contained by the [police department] concerning arrests, stops, inquiries, searches of defendant's home, car(s), and any other police encounters concerning [defendant]," the Court of Appeals determined that it was reasonable for the trial court to conclude that defendant's subpoena duces tecum was unreasonable and oppressive).

## VII

Defendant contends that the trial court erred in denying him credit time for pretrial detention. As discussed *supra*, defendant was serving a federal sentence when he was brought to Indiana to face pending criminal charges. On two separate occasions, defendant was detained in the Clark County Jail before being convicted for the crime of Murder. The trial court determined that because defendant was incarcerated for some other crime by some other court, he was not entitled to credit for the time served in Indiana. We affirm the trial court's decision.

---

**39.** A subpoena duces tecum "may command the person to whom it is directed to produce the books, documents, or tangible things designated therein; but the court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith." Ind.Crim.R. 2; Ind. Trial Rule 45(B).

Ind.Code § 35–50–6–3 (1988) [40] establishes the credit time that may be earned by a defendant. There are two criteria to consider in determining whether a defendant has a right to pretrial credit: (1) pretrial confinement (2) which was a result of the criminal charge for which sentence is now imposed. *Cohen v. State*, 560 N.E.2d 1246, 1249 (Ind.1990). [41] *Id.*

The facts of this case are substantially similar to the facts in *Smith v. State*, 165 Ind.App. 37, 330 N.E.2d 384, 388 (Ind.Ct. App.1975). After being released on bail from state charges, defendant Smith was convicted for another crime and incarcerated in federal prison. The State of Indiana, pursuant to a Writ, obtained temporary custody of Smith from federal authorities. Smith argued that he should receive credit time for the period after Indiana assumed jurisdiction over him. The Court of Appeals denied pre-trial credit time because Smith's incarceration "was occasioned by his conviction in federal court, and not by reason of the charges in the case at bar." *Smith*, 330 N.E.2d at 388. Additionally, the court noted that the trial court's custody of defendant "was with the permission and on behalf of federal officials." *Id.* Similarly, defendant in this case was incarcerated as a result of his federal conviction and not due to the charges filed by the State of Indiana. For the same reason, we find that defendant should be denied pre-trial credit time.

## VIII

Defendant contends that the trial court erred by using an improper factor to enhance his sentence and for failing to articulate the reasons for imposing consecutive sentences. The trial court sentenced defendant to the presumptive term of 40 years and added an additional 20 years for aggravating circumstances. Also, the Indiana sentence was ordered to be served consecutive to the federal sentence. We affirm the trial court's sentencing decision.

### A

Ind.Code § 35–38–1–7.1(b)(4) (1990) permits courts to consider whether the "imposition of a reduced sentence or suspension of a sentence and the imposition of probation would depreciate the seriousness of the crime," as an aggravating factor when determining the proper sentence to be imposed. However, we have stated on numerous occasions that this factor "may be used only when considering the imposition of a sentence of shorter duration than the presumptive sentence." *Mitchem v. State*, 685 N.E.2d 671, 679 (Ind.1997) (quoting *Jones*, 675 N.E.2d at 1088; *Gregory-Bey v. State*, 669 N.E.2d 154, 159 (Ind.1996) (quoting *Ector v. State*, 639 N.E.2d 1014, 1015 (Ind.1994))). This factor may not be used, as it appears to have been here, as the basis for enhancing a sentence. Because there is nothing in the record to indicate that the trial court was considering a reduced sentence, the use of this aggravating factor was inappropriate.

Nevertheless, we find the enhanced sentence to be reasonable in light of the other aggravating factors that the trial court identified. *See Widener v. State*, 659 N.E.2d 529, 533 (Ind.1995) ("The improper use of the 'depreciate seriousness' aggravating circumstance will not necessarily invalidate a sentence enhancement where other valid aggravating circumstances are found. *Ector v. State*, 639 N.E.2d 1014, 1016 (Ind.1994)"). The court justified the enhanced sentence with the following other aggravating factors: (1) defendant's criminal history; (2) the cruelty perpetuated by defendant upon the Guthrie family by having information which he did not reveal for a long period of time; and (3) the victim's physical condition at the

---

40. Ind.Code § 35–50–6–3(a) (1988) provides: A person assigned to Class I earns one (1) day of credit time for each day he is imprisoned for a crime or confined awaiting trial or sentencing.

41. We note that "[w]hen multistate charges have been filed against [a defendant], he has the burden on appellate review to establish that his out-of-state confinement was a direct result of the criminal charges which were also filed against him by another state." *Cohen v. State*, 560 N.E.2d 1246, 1249 (Ind.1990). Defendant is not entitled to any pre-trial credit for the time he was in federal custody. Defendant was in federal custody as a result of federal charges and not because of charges pending in Indiana.

time of the murder. We find all of these factors which the court considered to be proper under Ind.Code § 35–38–1–7.1(b) (Supp.1990). The court specifically found no mitigating circumstances to exist.

### B

■ Defendant also contends that since the trial court did not articulate any reasons for consecutive sentencing, the matter should be remanded to the court for an appropriate explanation. Br. of Appellant at 30. While we agree that the trial court gave no explanation for its imposition of consecutive sentences, we do not believe an explanation was necessary due to the circumstances of this case.

■ It is not contrary to law for a defendant's State sentence to commence after the service of his Federal sentence. *Ridley v. State,* 690 N.E.2d 177, 182 (Ind.1997); *Shropshire v. State,* 501 N.E.2d 445, 446 (Ind.1986). "[I]t is established law that there is no right to serve concurrent sentences for different crimes in the absence of a statute so providing, and that concurrent sentences may be ordered only when they are to be served at the same institution." *Id.* (quoting *Smith v. State,* 165 Ind.App. 37, 330 N.E.2d 384 (1975)). *See Carrion v. State,* 619 N.E.2d 972, 973 (Ind.Ct.App.1993). Additionally, "a defendant is not even entitled to credit on his Indiana sentence while he is incarcerated in another jurisdiction for a totally different offense." *Carrion,* 619 N.E.2d at 973 (citations omitted).

At the time that defendant was sentenced, Ind.Code § 35–50–1–2 (1988), was in effect. This statutory provision provides in pertinent part: "(a) ... the court shall determine whether terms of imprisonment shall be served concurrently or consecutively." We recently determined that this provision is "an express grant of authority to the trial court to impose consecutive sentences" and noted that this section has been "held to include the authority to impose a sentence consecutive to that of another jurisdiction." *Ridley v. State,* 690 N.E.2d 177, 182 (Ind.1997) (citing *Penick v. State,* 659 N.E.2d 484, 489 (Ind. 1995); *Carrion,* 619 N.E.2d at 973). *See Morrow v. State,* 690 N.E.2d 183, 184 (Ind.

1997). The trial court was authorized to order the defendant's Indiana sentence to be served consecutive with his federal sentence.

### IX

Defendant contends that the trial court erred by not allowing testimony of the complete statement given by defendant to federal authorities. Defendant contends that the court should have permitted him to introduce "evidence that Guthrie owed money to some cocaine dealers and that there was some indication that Guthrie may have been being followed by a blue van [which allegedly belongs to the cocaine dealers]." Br. of Appellant at 31. In other words, defendant seems to suggest that since incriminating portions of his statement were admitted, he was entitled to introduce the exculpatory portions of the statement as well.

■ Generally, a defendant who does not testify cannot introduce exculpatory statements made outside of court in order to enhance his credibility at trial. *See Canaan v. State,* 541 N.E.2d 894, 904 (Ind.1989); *Washburn v. State,* 499 N.E.2d 264, 268 (Ind. 1986). However, defendant correctly notes that "When one party introduces part of a conversation or document, opposing party is generally entitled to have the entire conversation or entire instrument placed into evidence." *McElroy v. State,* 553 N.E.2d 835, 839 (Ind.1990). *See Evans v. State,* 643 N.E.2d 877, 881 (Ind.1994). This rule is often referred to as the doctrine of completeness. "The remainder of the statement or document is subject to the general rules of admissibility, however, and any portions found immaterial, irrelevant, or prejudicial must be redacted." *Evans,* 643 N.E.2d at 881. *See Saperito v. State,* 490 N.E.2d 274 (Ind.1986); *Ryans v. State,* 518 N.E.2d 494, 496 (Ind.Ct.App.1988). We recently held that the doctrine of completeness applies for even self-serving hearsay statements. *McElroy,* 553 N.E.2d at 839. "In balancing the potential harm resulting from the introduction of self-serving hearsay against that resulting from the *exclusion of relevant portions* of prior statements otherwise admitted, we find persuasive the policy expressed in Ind.Trial Rule 43(A): 'In any case, the stat-

ute or rule which favors the reception of evidence governs....'" *Id.* at 839–40. (emphasis added).

■ The trial judge focussed on the words "fairness ought to be considered contemporaneously with it" from Ind.Evid.R. 106[42] and the words "exclusion of relevant portions" from the *McElroy* case. Consequently, the court ruled "that only those portions of the statement given by [defendant] that are relevant and that relate to the context regarding his discovery of the body of Danny Guthrie will be admitted through the testimony of this police officer." (R. at 1454–55.) The defendant's statements regarding money that defendant contended Guthrie owed to cocaine dealers and the asserted presence of a blue van was not relevant to the discovery of Guthrie's body.[43] As such, we find no error in the trial court's decision to exclude this evidence.

### X

■ Defendant contends that the trial court erred by not allowing testimony of other possible reasons for the death of Guthrie. However, defendant provides us with no citation to the record pertaining to evidence of alternate explanations of Guthrie's death. A party must support its argument with citations to appropriate sections of the record. *See* Ind. Appellate Rule 8.3(A)(7); *Wrinkles v. State*, 690 N.E.2d 1156, 1164 (Ind.1998).

■ In this argument, defendant also complains that the State performed no tests to exclude the possibility of suicide. We find no merit to this claim since defendant's own expert testified, out of the presence of the jury, to the following:

My opinion will be to this Jury that this was not a self-inflicted gunshot wound,

that there were fragments of metal in this wound and in this cadaver when it was exhumed that are unexplained, and that there was definitely room for procedures to be done to make some determinations in this investigation which were omitted at the time the investigation was done by both investigating officers and the medical examiner's office.

(R. at 1710.)[44]

### XI

Defendant contends that the State did not present evidence to establish the corpus delicti for murder. According to defendant, absent his statement, "the State could not even establish that Guthrie was dead, since he was missing and the State had found no body." Br. of Appellant at 34. We disagree.

■ "A crime may not be proven solely on the basis of a confession." *Light v. State*, 547 N.E.2d 1073, 1080 (Ind.1989). There must be some other proof of the crime, "in order to prevent confessions to crimes which never occurred." *Id.* (citing *Smith v. State*, 167 Ind.App. 428, 339 N.E.2d 118 (1975)). "In Indiana, to support the introduction of a defendant's confession into evidence, the corpus delicti of the crime must be established by independent evidence of (1) the occurrence of the specific kind of injury and (2) someone's criminal act as the cause of the injury." *Stevens v. State*, 691 N.E.2d 412, 424–25 (Ind.1997) (quoting *Willoughby v. State*, 552 N.E.2d 462, 466 (Ind.1990)). *See Moore v. State*, 498 N.E.2d 1,4 (Ind. 1986); *Anthony v. State*, 274 Ind. 206, 409 N.E.2d 632, 635 (1980). "[T]he independent evidence need not be shown beyond a reasonable doubt; rather, the evidence need only provide an *inference* that a crime was committed." *Stevens*, 691 N.E.2d at 425 (citing

42. Indiana Evidence Rule 106 provides:
When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require *at that time* the introduction of any other part or any other writing or recorded statement which *in fairness ought to be considered contemporaneously with it*. (emphasis added).

43. Defendant was provided some latitude in that he was permitted to cross-examine Detective Kramer in order to present defendant's state-

ments that Guthrie was "involved [in] business deals that went bad in connection with saddles and horses and livestock ...." and that Guthrie had re-ignited a partnership with defendant in connection with marijuana cultivation. (R. at 1429.)

44. This testimony was actually elicited on cross-examination by the State, but the witness offered similar evidence on direct examination by defendant. (R. at 1707.)

*Johnson v. State,* 653 N.E.2d 478, 480 (Ind. 1995)). Such inference may be established through circumstantial evidence. *See Moore,* 498 N.E.2d at 4; *Anthony,* 274 Ind. 206, 409 N.E.2d 632, 635 (1980) (citations omitted).

■ We begin by noting that defendant's statements to federal authorities did not constitute a confession. Indeed, defendant at all times proclaimed that he was innocent and only admitted to finding Guthrie dead and to having knowledge as to the whereabouts of Guthrie's body. Nevertheless, even without defendant's statements relating to finding Guthrie dead with a gunshot wound to the head, there was a sufficient evidence to establish corpus delicti. The medical examiner testified that Guthrie's death was a result of a gunshot wound to the face. A firearm's expert testified that the bullet which killed Guthrie was fired from defendant's 9mm gun. The medical examiner also testified that no gunpowder residue was found on the external surface of Guthrie's bones. Although the evidence did not exclude the possibility that Guthrie committed suicide, there was sufficient evidence, both physical and circumstantial, to create a reasonable inference that a crime occurred and thus establish corpus delicti. "The independent evidence supporting the corpus delicti need not preclude every possible explanation of the circumstances." [45] *Stevens,* 691 N.E.2d at 425 (quoting *Johnson,* 653 N.E.2d at 480 n. 4). *See Grey v. State,* 273 Ind. 439, 404 N.E.2d 1348, 1351 (Ind. 1980) ("although the circumstances did not exclude the hypothesis that the child had been injured in some other manner," because the lacerations to child's vagina were consistent with rape, corpus delicti had been established as a result of the reasonable inference created); *Light v. State,* 547 N.E.2d 1073, 1080 (Ind.1989) (forensic pathologist's testimony that victim's fatal skull injuries by either a hammer, tire tool, or a large rock adequately established corpus delicti); *Harkrader v. State,* 553 N.E.2d 1231, 1233–34 (Ind.App.1990) (where defendant was convicted of dealing in a controlled substance,

the court determined that corpus delicti had been established "Although the evidence does not exclude the hypothesis that [the codefendant] found the pills, stole them, or manufactured them herself, the evidence gives rise to a reasonable inference that someone had delivered the pills to [the codefendant].")

### Conclusion

We affirm defendant's conviction and sentence.

SHEPARD, C.J., and DICKSON, SELBY and BOEHM, JJ., concur.

45. "A dead body alone is not proof of the corpus delicti in a homicide case; but an identified dead body with marks of violence thereon or surrounding circumstances that would indicate the deceased did not die from natural causes established prima facie that a homicide has been committed and the corpus delicti." *Stevens v. State,* 691 N.E.2d 412, 425 (Ind.1997) (quoting *Brown v. State,* 239 Ind. 184, 154 N.E.2d 720 (1958)).